UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**OPPENHEIMER & CO., INC.,**

      **Plaintiff,**

v.                                           Case No. 6:23-cv-113-CEM-EJK

**SYLVIA MAJANI,**

      **Defendant.**
_____/

**ORDER**

THIS CAUSE is before the Court on Plaintiff's Motion for Preliminary Injunction ("Motion," Doc. 3). Defendant filed a Response (Doc. 16), and the Court held an evidentiary hearing, (*see generally* Min. Entry, Doc. 27). For the reasons set forth below, the Motion will be denied and this case will be stayed.

**I.    BACKGROUND**

Plaintiff Oppenheimer & Co., Inc. ("Oppenheimer") is a Financial Industry Regulatory Authority ("FINRA") registered "broker/dealer headquartered in New York with approximately 90 branch offices in the United States, including in Atlanta, Georgia." (Oppenheimer's Answer to Am. Statement of Claim, Doc. 16-1, at 219; *see also* Am. Statement of Claim, Doc. 28-2, at 1). Non-party John Woods "was a registered representative with Oppenheimer and its predecessor firms in

Oppenheimer's Atlanta office from 1991 to 2016." (Doc. 16-1 at 219; Doc. 28-2 at 1–2). Non-Party John Disosway is Defendant Sylvia Majani's husband. (Majani Decl., Doc. 16-3, at 1). Disosway began working with Oppenheimer through Woods in 2005. (*Id.*). Starting in 2012, Majani attended meetings with Disosway and Woods at Oppenheimer's offices where Woods spoke to them about investing in an entity called Horizon Private Equity ("Horizon"). (*Id.* at 2). Between 2012 and 2015, Majani continued to have conversations with Woods and Non-Party Michael Mooney about investing in Horizon. (*Id.* at 2–3). Mooney was a registered representative with Oppenheimer from 2007 through 2010, (Mooney Decl., Doc. 16-2, at 1), but he was no longer employed by Oppenheimer at the time of these conversations, (Joint Stipulation of Undisputed Facts, Doc. 28-3, at 3). However, Majani testified at the hearing that Woods held Mooney out as working with Oppenheimer. (*See also* Doc. 16-3 at 2 ("Michael Mooney was in the Oppenheimer offices in several meetings with John Woods."); *id.* at 3 ("Each meeting with John Woods or Mike Mooney was at or near the Oppenheimer Atlanta office. I had no doubt after these multiple meetings that John Woods[ and] Michael Mooney . . . were with Oppenheimer . . . .")).

Majani testified that Woods convinced her to invest in Horizon during the 2013 timeframe, but she could not do so until 2015 because her money was in investments where she would have to pay a penalty if she took the money out early.

Majani invested in Horizon in 2015. She testified that this investment was based on her discussions with Woods and because he was associated with Oppenheimer. (*See also id.* at 3 ("The fact that John Woods had worked with Oppenheimer for many years gave us a feeling of confidence investing the bulk of our retirement proceeds in Horizon.")). Once she decided to invest, "[i]n agreement with [Woods], [Mooney] helped to complete [Majani's] paperwork." (*Id.*).

In August 2021, the Securities and Exchange Commission filed a civil enforcement action against Woods and his companies, alleging that Horizon was a Ponzi scheme. (*See generally* SEC Compl., Doc. 16-1). On December 28, 2021, Majani and several other claimants initiated a FINRA arbitration against Oppenheimer, seeking to hold Oppenheimer liable for their losses associated with Woods and Horizon. (*See generally* Statement of Claim, Doc. 28-1). On March 11, 2022, an Amended Statement of Claim was filed, which remains the operative Statement of Claim in the underlying FINRA arbitration. (*See generally* Doc. 28-2). The FINRA arbitration final hearing is set to begin on Monday, March 13, 2023. (Scheduling Order, Doc. 16-1, at 239, 242).

On January 20, 2023, Oppenheimer initiated this case seeking a declaratory judgment that Oppenheimer has no obligation to arbitrate Majani's claims and injunctive relief, enjoining Majani from arbitrating against Oppenheimer. (*See*

*generally* Compl., Doc. 1). Oppenheimer has now moved for a preliminary injunction.

## II.   LEGAL STANDARD

To obtain a preliminary injunction, the movant must sufficiently establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). "A preliminary injunction, moreover, 'is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites.'" *Llovera v. Fla.*, 576 F. App'x 894, 896 (11th Cir. 2014) (per curiam) (quoting *Forsyth Cnty.*, 633 F.3d at 1039).

## III.   ANALYSIS

### A.   Likelihood of Success on the Merits

The parties agree that FINRA Rule 12200 constitutes the arbitration agreement at issue here. *See Pictet Overseas Inc. v. Helvetia Tr.*, 905 F.3d 1183, 1187 (11th Cir. 2018) (explaining that when a party joins FINRA, membership includes an agreement to abide by FINRA's Rules, which include an arbitration

provision, and therefore, joining FINRA "'itself constitute[s] the agreement' to arbitrate" (quoting *MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004))). Courts "interpret the FINRA Arbitration Code as [they] 'would a contract under the applicable state law.'" *Id.* at 1188 (quotation omitted). "Because the FINRA Arbitration Code is unambiguous, 'the parties' intent must be gleaned from the four corners of the document.' '[T]he language' of the Code itself 'is the best evidence of the parties' intent, and its plain meaning controls.'" *Id.* (quoting *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011)). "And [courts] should determine the parties' intent 'from the words of the contract as a whole.'" *Id.* (quoting *City of Tampa v. Ezell*, 902 So. 2d 912, 914 (Fla. 2d DCA 2005)). However, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

FINRA Rule 12200 provides, in relevant part:

> Parties must arbitrate a dispute under the Code if:
>
> •Arbitration under the Code is either:
>
> > (1) Required by a written agreement, or
> >
> > (2) Requested by the customer;
>
> •The dispute is between a customer and a member or associated person of a member; and
>
> •The dispute arises in connection with the business activities of the member or the associated person,

> except disputes involving the insurance business activities of a member that is also an insurance company.

The parties agree that there is no written agreement, so the second option of the first factor—where the arbitration is requested by a customer—is at issue here. Oppenheimer does not dispute that it is a FINRA member. Oppenheimer also does not appear to dispute that Majani could be categorized as a "customer," generally. *See* FINRA R. 0160(b)(4) (defining "customer" in the negative and stating that "[t]he term 'customer' shall not include a broker or dealer"). Instead, Oppenheimer argues that Majani was not *its* customer nor a customer of "an associated person of" Oppenheimer, and therefore, the first factor is not satisfied. *See UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 649–50 (2d Cir. 2011) (discussing that the FINRA Rules do not provide a "precise definition of 'customer,'" collecting authority discussing the definition, and quoting "[a]n online FINRA glossary," which "states that a 'customer' is '[a] person or entity (not acting in the capacity of an associated person or member) that transacts business with any member firm and/or associated person.'"); *BNY Mellon Cap. Mkts., LLC v. Paone*, No. 19-81412-CIV, 2019 U.S. Dist. LEXIS 221434, at *6–8 (S.D. Fla. Dec. 26, 2019) (collecting cases that define the term "customer" in this context). It is undisputed that, during the relevant timeframe, Woods was an associated person of Oppenheimer and

Mooney was not. Oppenheimer argues that Majani was a customer of Mooney, not Woods.[1]

As noted above, the dispute here arises from Majani's investment in Horizon. Oppenheimer asserts that, factually, Majani's business activities relating to her investment with Horizon were with Mooney, not Woods. Oppenheimer attempts to draw a narrow box around a single paragraph in the Amended Statement of Claim filed in the arbitration, where Majani only mentions Mooney. (Doc. 28-2 at 8; *see also* Doc. 28-1 at 5 (setting forth substantially the same allegations in the original Statement of Claim as the Amended Statement of Claim)). And, at the hearing, Oppenheimer's counsel argued that the investments were based on Majani's and her husband's friendship with Mooney. But those allegations are not borne out by the evidence presented.

Majani testified that she had an ongoing professional relationship with Woods, she met with Woods at Oppenheimer's offices, and she spoke to Woods about investing in Horizon many times between 2012 and 2015. (*See also* Doc. 16-3 at 2–3). Majani also offered evidence that one of the primary reasons why she

---

[1] Oppenheimer also notes that Majani did not have any formal agreements with Oppenheimer directly, but that is not necessarily a requirement. If Majani has a customer relationship with Oppenheimer's broker—here Woods—Majani can be considered Oppenheimer's customer through its associated person. *Multi-Financial Sec., Corp. v. King*, 386 F.3d 1364, 1368 (11th Cir. 2004) (applying this analysis to the National Association of Securities Dealers Code of Arbitration, which was the predecessor of FINRA and where the arbitration issue is substantively the same).

invested in Horizon was "the fact that John Woods had worked with Oppenheimer for many years," which "gave [her and her husband] a feeling of confidence investing the bulk of [their] retirement proceeds in Horizon." (*Id.* at 3). Additionally, while Majani admitted that Mooney was the one who assisted her in filling out the paperwork, she offered evidence that this was done "in agreement with John Woods." (*Id.*).

Obviously, the Court is proceeding on a limited record at this stage, but the evidence presented leans in favor of establishing that Majani was a customer of Woods, who was an associated person of Oppenheimer.[2] And, at least for purposes of this Motion, the parties do not dispute that the remaining elements required under FINRA Rule 12200 are met. Therefore, Oppenheimer has not met its burden to establish a substantial likelihood of success on the merits of its claim.

B.   **Irreparable Injury**

Oppenheimer has also failed to meet its burden as to irreparable injury. "A showing of irreparable injury is the *sine qua non* of injunctive relief." *Hoop Culture, Inc. v. Gap Inc.*, 648 F. App'x 981, 984 (11th Cir. 2016) (citing *Siegel*, 234 F.3d at 1176). That is, "the absence of a showing of irreparable injury, 'would, standing alone, make preliminary injunctive relief improper.'" *Id.* (citing *Siegel*, 234 F.3d at

---

[2] For these reasons, the cases relied on by Oppenheimer are inapposite because they found that the defendants, factually, were not customers of the member or the person associated with the member. *See, e.g., Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 384–85 (4th Cir. 2013).

1176). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). "Mere injuries, however substantial, in terms of money . . . are not enough." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *accord United States v. Jefferson Cnty.*, 720 F.2d 1511, 1520 (11th Cir. 1983)).

Generally, in the Eleventh Circuit the prospect of being faced with an improper arbitration, on its own, is likely insufficient to establish irreparable injury. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, at 1112 n.20 (11th Cir. 2004). In the context of a FINRA arbitration, however, there is a potential prospect of irreparable harm because refusal to participate in FINRA arbitration can "result in a suspension or cancellation of [FINRA] membership," which is a "harm that cannot simply be undone through monetary remedies." *Raymond James Fin. Servs. v. Armijos*, No. 19-CIV-81692-RAR, 2020 U.S. Dist. LEXIS 109149, at *12 (S.D. Fla. Jan. 9, 2020). However, it is not clear that such irreparable injury would occur here because Oppenheimer will participate in the arbitration regardless of the outcome of this litigation. There are a number of substantially overlapping claims being arbitrated in the same proceeding, and Oppenheimer has admitted that it plans on participating because many of the other individuals—including Majani's husband—are entitled to arbitrate their claims. This fact also ameliorates any other harm that could occur by being forced to arbitrate—such as the time and expense of

arbitration—because Oppenheimer is expending those resources regardless of whether Majani's claims are included.

Moreover, "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Majani initiated the arbitration in December 2021. Oppenheimer contested Majani's entitlement to a FINRA arbitration in its Answer, which was filed on April 7, 2022. (Doc. 16-1 at 216, 223, 237). On May 9, 2022, the arbitration scheduling order was issued, which set the arbitration hearing to begin on March 13, 2023. (*Id.* at 239, 242). And yet, Oppenheimer did not file this case until January 20, 2023—more than nine months after Oppenheimer was aware of this defense and more than eight months after Oppenheimer was apprised of the date of arbitration. At this point, Oppenheimer has substantially participated in the arbitration proceedings, including conducting discovery, and has provided no explanation as to why it waited until the eve of the arbitration hearing to seek relief. Thus, Oppenheimer's delay militates against a finding of irreparable harm.

### C. Balance of Harms

It is also important to note that the balance of harms here weighs in favor of Majani. As noted above, Oppenheimer has already participated in discovery regarding Majani's claims and Oppenheimer admits that it is required to participate

in the arbitration regardless of whether Majani's claims are arbitrated. Thus, even if ultimately it is concluded that Majani is not entitled to arbitrate her claims, Oppenheimer is essentially in the same posture regardless of the Court's decision on this Motion. In other words, if the injunction is granted, Oppenheimer would still need to arbitrate the co-claimants' claims and continue to litigate the arbitrability of Majani's claims in this Court. If the preliminary injunction is not granted, Oppenheimer will arbitrate in the same manner and then, if it loses, continue to litigate the arbitrability of Majani's claims in this Court. In fact, if Oppenheimer prevails in the arbitration, it will be better positioned than if the preliminary injunction were granted because the necessity of litigating any further in this Court would be removed.

On the other hand, if Majani is erroneously enjoined from arbitrating her claims with the other similarly situated co-claimants, she will face significant harm. Her arbitration that has been pending for over a year will be delayed, and more importantly, she would be forced to arbitrate her claims alone rather than sharing the costs with the other co-claimants. The balance of harms clearly weighs in favor of denying the preliminary injunction.

### D. Public Interest

Oppenheimer's only argument as to the public interest is that forcing an arbitration to proceed without an agreement to arbitrate does not serve the public

interest. However, as explained above, Oppenheimer has not established that this arbitration should not be permitted to proceed, and therefore, Oppenheimer has not shown that this factor weighs in its favor.

### IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Preliminary Injunction (Doc. 3) is **DENIED**.
2. This case is **STAYED** pending the outcome of the underlying arbitration.
3. **On or before May 16, 2023**, Oppenheimer shall file a report with the Court as to the status of the underlying arbitration and the need for further litigation of this case.
4. The Clerk is directed to administratively close this case.

**DONE** and **ORDERED** in Orlando, Florida on March 8, 2023.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record